(88 Misc. Rep. 148)

McCUTCHEON v. TERMINAL STATION COMMISSION OF CITY OF
BUFFALO et al.

(Supreme Court, Equity Term, Erie County.   December 21, 1914.)

1. CERTIORARI (§ 33*)—GROUNDS—DECISION OF TERMINAL COMMISSION.

A taxpayer of Buffalo, who appeared at a hearing set by the terminal
station commission and objected to the proposed plan subsequently
adopted for a certain terminal, could bring certiorari to review the deci-
sion of the commission.

[Ed. Note.—For other cases, see Certiorari, Cent. Dig. § 44; Dec. Dig.
§ 33.*]

2. MUNICIPAL CORPORATIONS (§ 990*)—REMEDIES OF TAXPAYER—ACTS OF TER-
MINAL COMMISSION.

In an action under Code Civ. Proc. § 1925, and General Municipal Law
(Consol. Laws, c. 24) § 51, authorizing a taxpayer's action to prevent any
illegal act, or a waste or injury to municipal property, against the Buffalo
terminal station commission and certain railroads, to have declared il-
legal a contract between the commission and the railroads for the con-
struction of a railroad terminal, the court cannot pass upon the wisdom
or feasibility of the plan for the proposed terminal, but only upon the
question whether the commission in adopting it exceeded its legal pow-
ers; there being no charge of fraud, collusion, or bad faith.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
2151–2156; Dec. Dig. § 990.*]

3. RAILROADS (§ 75*)—TERMINALS—MODIFICATION OF PLANS—HEARING.

Under Laws 1911, c. 842, creating the terminal station commission of
Buffalo, section 3 of which provides that, before adopting, altering, or
modifying any plan, the commission shall give notice and opportunity to
be heard, when any interested party may appear and examine witnesses
as to the feasibility of the proposed plan, and of any alteration or modi-
fication thereof, or any new plan which may be suggested, and that there-
after the commission shall make a report in writing, wherein they shall
state the plan adopted by them, the commission is not required to give a
new notice and hold a new hearing before the final adoption of the plan,
after they have made modifications in the proposed plan at the first hear-
ing; the requirement for a hearing before altering or modifying any plan
referring to an alteration or modification of a plan once finally adopted.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec.
Dig. § 75.*]

4. MUNICIPAL CORPORATIONS (§§ 680, 681*)—RAILROAD TERMINALS—POWERS OF
COMMISSION—LAYING NEW TRACK.

Laws 1911, c. 842, creating the Buffalo terminal station commission,
section 1 of which authorized the commission to adopt plans for the relief
of the congested condition of the railroad terminals in Buffalo, and to re-
quire the railroads to make such changes in their tracks as might be
necessary, and section 17 of which provided that the provisions of other
acts, including the charter of Buffalo, so far as inconsistent with the
Commission Act, should not apply to the rights and powers of the com-
mission, when construed to effectuate its purpose, authorizes the com-
mission to permit the laying of a track at grade along a city street, where
that is necessary to carry out the plan adopted.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
1459–1466; Dec. Dig. §§ 680, 681.*]

5. MUNICIPAL CORPORATIONS (§§ 680, 681*)—RAILROAD TERMINALS—POWERS
OF COMMISSION—GRADE CROSSING.

The commission might also · authorize the continuance of one track
crossing a much-traveled street at grade, to be used only in emergencies

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

as regulated by the state public service commission, where such track was shown by the evidence to be reasonably necessary.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

6. MUNICIPAL CORPORATIONS (§§ 680, 681*)—RAILROAD TERMINALS—POWERS OF COMMISSION—OVERHEAD CROSSING.

The commission can also authorize the railroad, in constructing its overhead crossing over a street, to place a support in the middle of the street, where it appeared that a single girder structure would not be as suitable.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

7. MUNICIPAL CORPORATIONS (§ 328*)—RAILROAD TERMINALS—POWERS OF COMMISSION—EXCHANGE OF CITY PROPERTY.

Under Laws 1911, c. 842, § 1, authorizing the terminal station commission of Buffalo to require a railroad to make necessary changes in the location of the station and tracks, and the city to relocate its streets, alleys, or lands owned by the city, section 5, authorizing the commission on the part of the city to contract for the change of location of any street, alley, or public place, and for the sale or exchange of lands owned by the city at an appraised price, section 7, providing for the appraisal of the lands to be taken or exchanged, and section 9, authorizing the commission to acquire any lands in the city and to change in and remove from any street or public place gas or water pipes, the commission was authorized to contract on behalf of the city for the construction by the railroads of a new fireboat slip to take the place of an old one over which the tracks for the new terminal were to run, and to change the location of water mains from a street which the commission closed to a triangular piece of ground to be conveyed by the railroads to the city for that purpose.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. § 851; Dec. Dig. § 328.*]

8. RAILROADS (§ 75*)—TERMINALS—CONTRACT—MISTAKE.

A contract between the terminal station commission of Buffalo and certain railroads for the construction of a new railroad terminal is not void because it provided that the railroad should convey to the city a certain tract of land which was in fact included within a street, the fee of which was owned by the city and which was to be closed and transferred to the railroad, and because it included such tract among those to be appraised, since the provision was manifestly an oversight, which might be disregarded, and, if literally carried out, would leave both the city and the railroad in the same situation as before.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

9. MUNICIPAL CORPORATIONS (§ 873*)—STREETS—VACATION—RIGHT TO COMPENSATION.

The right to the use of a public street, the fee of which is not owned by the city, is vested in the public at large, and not in the city, and the Buffalo terminal station commission is not prohibited from closing such streets, without compensation to the city, by Const. art. 8, § 10, providing that no city shall give any money or property to or in aid of any individual or corporation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1845–1850; Dec. Dig. § 873.*]

10. MUNICIPAL CORPORATIONS (§ 657*) — STREETS — VACATION — LEGISLATIVE CONTROL.

The power to close streets is vested in the Legislature as the representative of the state, and may be delegated by it to public officials.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 722, 844, 1429, 1496; Dec. Dig. § 657.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

11. RAILROADS (§ 75*)—RIGHT OF WAY—STREETS—VACATION—RIGHT TO COM-
PENSATION.

The provisions of Laws 1911, c. 842, § 9, authorizing the terminal sta-
tion commission to close any street necessary to carry out the plans, and
making applicable the provisions of section 7 for the purpose of acquir-
ing title to lands necessary to be taken, and section 7, requiring the ap-
praisers of lands necessary to be taken to ascertain the fair market value
of any lands owned by the city, to be exchanged or sold by it, do not re-
quire the railroads to pay to the city compensation for the closing of
streets, the fee of which is not owned by the city.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec.
Dig. § 75.*]

12. MUNICIPAL CORPORATIONS (§ 663*)—STREETS—VACATION—EFFECT.

The effect of the closing of a street is to relieve the land of the public
easement theretofore existing, and the owner of the fee then becomes the
owner of the land discharged from the easement.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
1438–1440; Dec. Dig. § 663.*]

13. MUNICIPAL CORPORATIONS (§ 990*)—RAILROAD TERMINALS—CLOSING OF
STREETS—OWNERSHIP OF FEE.

In a taxpayer's action to have declared illegal a contract between the
terminal station commission of Buffalo and certain railroads, which pro-
vided, among other things, for the closing of certain streets of which the
city did not own the fee, it is immaterial whether the fee was entirely
owned by the railroads, or whether other parties owned an interest
therein, since the railroad would have to acquire outstanding interests, if
there were any.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§
2151–2156; Dec. Dig. § 990.*]

14. MUNICIPAL CORPORATIONS (§ 654*)—STREETS—ESTABLISHMENT—EVIDENCE.

In an action to set aside a contract between the Buffalo terminal sta-
tion commission and certain railroads, which provided, among other
things, for the closing of a street, the existence of which had been ques-
tioned by the railroad, evidence *held* insufficient to show that the street
had been formally opened, or dedicated, or recognized by the adjoining
owner as such.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1428; Dec. Dig. § 654.*]

15. MUNICIPAL CORPORATIONS (§ 658*)—STREETS—ESTABLISHMENT—PRESCRIP-
TION.

Where a public street has been acquired by user only, the rights of the
public therein are confined to the established use.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §
1430; Dec. Dig. § 658.*]

16. JUDGMENT (§ 702*)—CONCLUSIVENESS—RULES OF DECISION—LAW OF THE
CASE.

A decision by the Court of Appeals, in an action by a city against a
railroad company, that any rights of the city in a street along the edge
of docks did not include the right to the use of the docks, is the law of
the case on such question in an action by a taxpayer of the city to set
aside a contract between the terminal station commission and the rail-
road, on the ground that the commission had no right to close that street.

[Ed. Note.—For other cases, see Judgment, Cent. Dig. § 1227; Dec. Dig.
§ 702.*]

17. RAILROADS (§ 75*)—TERMINALS—CONTRACTS.

A contract between the Buffalo terminal station commission and certain
railroads for the construction of a railroad terminal, whereby the commis-
sion closed a "so-called street," which consisted merely in the right of

the public, acquired by user, to travel over certain private docks along the river front, does not show an abuse of discretion on the part of the commission which renders the contract illegal, even if the terminal could have been built, though at greater expense and with lessened value, further back, so as not to interfere with the street.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

18. RAILROADS (§ 75*)—TERMINALS—CONTRACTS—SHIPPING FACILITIES.

A taxpayer cannot object to a contract between the Buffalo terminal station commission and certain railroads for the construction of a railroad terminal, on the ground that the plans embrace the offering of facilities for the traffic of lake steamers as well as that of the railroad, where the property to be used for that purpose already belonged to the railroad.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

19. MUNICIPAL CORPORATIONS (§§ 680, 681*) — RAILROAD TERMINALS — CONTRACTS—POWERS OF COMMISSION.

Under Laws 1911, c. 842, § 1, authorizing the terminal station commission of Buffalo to require the railroads or other transportation companies operating within the city to make necessary changes, and section 6, authorizing agreements between the city and any railroad or other transportation company, a contract between the commission and certain railroads for the construction of a new railroad terminal, which authorized the railroad company to use a portion of the property it already owned to provide better facilities for the transfer of business between it and lake steamers, does not exceed the commission's authority.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

20. RAILROADS (§ 75*)—TERMINALS—CONTRACT—ACQUISITION OF PROPERTY.

A contract between the Buffalo terminal station commission and certain railroads for the construction of a railroad terminal is not objectionable because it does not provide for compensation for the taking of the fee in a certain street, which was closed, and the ownership of which was in dispute between the city and another, since the railroad cannot construct its terminal thereon until it has acquired the fee from the owner, whoever that may be.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 183–191; Dec. Dig. § 75.*]

21. MUNICIPAL CORPORATIONS (§§ 680, 681*)—RAILROAD TERMINALS—POWERS OF COMMISSION.

Under Laws 1911, c. 842, § 6, authorizing the Buffalo terminal station commission to apportion the cost of the improvement between the railroads and the city, section 8, providing that, if the railroad and the commission cannot agree on such apportionment, it shall be fixed by the court, section 11, providing that the commission may require the railroad to do all the work and apportion the cost thereof, and section 15, providing that the city may issue bonds for its share of the work, the commission may provide by its contract that the railroads shall do all the work of relocating the streets and changing the grade, and that, if the appraised value of the property transferred by the city to the railroad shall exceed that of the property transferred by the railroad to the city, the difference shall be the amount of the cost of the street changes which shall be borne by the city, especially where that cost was very much less than might have been assessed against the city under the Grade Crossing Commission Act.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1459–1466; Dec. Dig. §§ 680, 681.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

22. MUNICIPAL CORPORATIONS (§ 873*) — RAILROAD TERMINALS — STATUTES — VALIDITY.

Those provisions of the statute do not violate Const. art. 8, § 10, prohibiting any city from giving its property or loaning its money or credit to or in aid of any individual or corporation.

[Ed. Note.—For other cases, see Municipal Corporations, Cent. Dig. §§ 1845–1850; Dec. Dig. § 873.*]

23. CONTRACTS (§ 137*)—PARTIAL INVALIDITY.

Though certain provisions of a contract between the Buffalo terminal station commission and a railroad for the construction of a terminal, under which contract large sums had already been expended by the railroad, were invalid, the whole contract would not be declared void, if it could be modified, so as to eliminate the illegal features.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 701–712; Dec. Dig. § 137.*]

Suit by Charles H. McCutcheon against the Terminal Station Commission of the City of Buffalo and others. Complaint dismissed on final hearing.

See, also, 149 N. Y. Supp. 1094.

Simon Fleischmann, Roland Crangle, B. Frank Dake, and Edward L. Jung, all of Buffalo, for plaintiff.

Louis L. Babcock and Charles B. Sears, both of Buffalo, for defendants Delaware, L. & W. R. Co. and another.

Wilber E. Houpt, of Buffalo, for defendant Terminal Station Commission.

William S. Rann and Ralph K. Robertson, both of Buffalo, for defendant city of Buffalo.

WHEELER, J. This is a suit in equity, brought by the plaintiff, as a taxpayer of the city of Buffalo, to have declared illegal and invalid a contract for certain terminal improvements entered into on the 6th day of September, 1913, between the commissioners of the terminal station commission of Buffalo and the railroad companies named above as parties defendant. There are no allegations in the complaint of fraud, collusion, or bad faith; but the plaintiff predicates his case upon allegations that the commissioners exceeded the authority and powers vested in them in executing the contract in question, and were therefore engaged in doing unlawful official acts within the meaning of the statute authorizing the maintenance of a taxpayer's action.

The terminal station commission of Buffalo was created by an act of the Legislature passed July 28, 1911, and known as chapter 842 of the Laws of 1911. The constitutionality of the act was directly attacked in the case of People ex rel. Simon v. Bradley, which was carried to the Court of Appeals. The constitutionality of the act was there sustained. The opinion of the court rendered on the decision of the case is found under the title of People ex rel. Simon v. Bradley, 207 N. Y. 592, 608, 609, 101 N. E. 766, 771. Judge Chase, on rendering the prevailing opinion of the court, very accurately described the general situation which led to the passage of this act in the following language:

"In considering that question we may take judicial notice of the location, size, and commercial importance of the city of Buffalo. It is conceded that

a large number of important trunk line railroads terminate in or pass through the city, and each has passenger and freight depots and accompanying terminal tracks, sidings, and switches within its boundaries. There are several hundred miles of railroad tracks in its streets at grade. The enormous amount of passenger and freight business within the city arises, not alone from its large population, but from its being a central point in railroad transportation and the Eastern terminal of navigation on the Great Lakes. The extent of the transportation business centered in the city makes the questions relating to grade crossings and terminal and depot facilities therein of great municipal and public importance. In determining such questions the conflicts that arise among public officers or bodies required to act thereon, groups of owners of real property situated in different sections of the city, and the several railroad and navigation corporations having independent and special interests involved, make it important that adequate authority and control should rest in some one body of men to determine and enforce plans by which the use of the city streets by railroads at grade shall be avoided and the handling of passengers and freight in the municipal and public interest shall be promoted."

The Lackawanna Railroad has, for many years past, crossed Michigan street, between Elk and Ohio streets, with two tracks overhead. These tracks are continued westerly and reach Ohio street, which runs in an easterly and westerly direction, between Mississippi and Liberty streets. The tracks continue westerly through Ohio street, first on an embankment, and then at grade along Ohio street, across Illinois street, Love Alley, and Indiana, Washington, and Main streets, to a small and incommodious passenger station on the westerly side of Main street. A retaining wall built in Ohio street on the southerly side of the main tracks of the Lackawanna, for a distance of about 400 feet from the westerly line of Liberty street to a point about 75 feet east of Illinois street, narrows the usable part of Ohio street, between Illinois and Mississippi streets, to about 30 feet.

In addition to the two tracks in Ohio street which we have mentioned, there is also a siding on the south side of the main tracks, from the center of Washington to the westerly side of Liberty street. In the block between Main and Washington streets, switches or sidings are given off from the main tracks, which cross Main street at grade, so there are five tracks at grade across Main street at this point. Along the Buffalo river, between Main street and Commercial slip, the Lackawanna has a large and busy freight house, with tracks at grade through Prime street, and across West Perry, Hanover, and Lloyd streets, and one track across Commercial street on an embankment in the street, and a little further to the west, at the entrance to the Buffalo river, where the railroad has an important coal trestle, where the coal handled each season amounts to about a million and a half tons. All the business to and from the passenger station, the lake freight house, and to the coal trestle now crosses Main street at grade.

This being the general situation, the State Public Service Commission made the matter the subject of official investigation, and conducted a proceeding instituted by itself with a view of removing the dangers at the foot of Main street. Public hearings were had. In December, 1910, the president of the Lackawanna Railroad submitted to the mayor of the city of Buffalo a plan for treatment of the entire situation. This plan was introduced in evidence on the trial of this case, and

is practically the plan subsequently adopted by the terminal commission, saving certain concessions to the city by the railroad. The Public Service Commission passed upon the plan submitted to the mayor, and on the 14th of December, 1910, in a communication dated that day, signed by all the commissioners, stated that no site was available for the Lackawanna, except near the foot of Main street, or on the outskirts of the city; that the land west of Main street was inadequate for the construction of a proper and adequate station building, and of adequate tracks, and that it was necessary, therefore, that the construction of the station be east of Main street; that the area east of Main street was inadequate without the closing or alteration of streets; that the plan of the station building proposed was approved as according with the dignity and importance of the traffic carried on and the community served; that necessity seemed to require that one track remain at grade across Main street.

On the 28th of July, 1911, the Terminal Station Act became a law. Litigation followed to test the constitutionality of the act, as above stated. After its constitutionality had been established, the terminal station commission, after careful consideration, and on December 16, 1911, gave notice that it proposed to adopt a plan relating to the Lackawanna situation, and gave notice of a public hearing as provided by section 3 of the act. On that hearing the plaintiff appeared by counsel, proposed a plan or plans in the place of those suggested by the commission, and gave testimony touching their advisability and feasibility. After such hearing, and after consideration of the matter, and on September 6, 1913, the terminal commission adopted the plan and entered into the contract now attacked.

By the plan and contract adequate terminal facilities are provided for the railroad company, and at the same time substantially all the tracks at grade are abolished by carrying the railroad of the defendant corporation over the streets at an elevation. There are certain exceptions to this which will be noted later in the opinion. To accomplish this, it became necessary to close and abandon certain streets or portions of streets, which will also be discussed further on in the opinion. The plan also involved the closing of the present Ohio street westerly from its junction with Elk street to the easterly line of Main street, and the location and opening of a new street in its place and stead, to the north of the present street and running parallel to it, to be also known as Ohio street. This will necessitate the acquisition for that purpose of quite a considerable amount of property held by private owners.

All these changes, and others, will more fully appear by the map of the plan adopted by the report of the commission, accompanying it, and by the provisions of the contract for carrying out the scheme of improvement, too voluminous to set out in detail. Some of these matters, the legality of which is questioned, will be discussed in this opinion. Sufficient, however, is indicated to show the importance of the questions involved.

It should, however, be here noted that there exists, by virtue of statute, what is commonly known as the "Grade Crossing Commission" of the city of Buffalo, to which body is given power and authority to

abolish grade railroad crossings in the city. This act, however, was amended by chapter 358 of the Laws of 1911, withdrawing from the jurisdiction of the grade crossing commission certain territory in the city, within which most of the stations, yards, and other terminal facilities of the many different railroads entering the city of Buffalo are located. The purpose of this amendment is to prevent a conflict of jurisdiction and authority between the two commissions, and to vest in the terminal commission full and complete power to deal with the entire situation, which necessarily involves, in most, if not all, cases, not only securing for the public and the railroads adequate terminal facilities, but at the same time abolishing, in so far as practicable and possible, the crossing of the public streets at grade.

The terminal commission and the railroad defendants contend that, in so far as the plan is concerned, the plaintiff's only remedy was to review the action of the commission by writ of certiorari, and having omitted to pursue that remedy, he cannot now by a taxpayer's suit attack the action of the commission as to the plan adopted.

[1] The evidence shows that the commission, before adopting the plan in question, pursued the directions of section 3 of the act, and gave a public hearing on the plan proposed. Mr. McCutcheon, the plaintiff, appeared by counsel at that hearing, offered objections to the plan proposed, and proposed plans of his own, which were duly considered. The commission, on September 6, 1913, took final action and adopted the plan now in dispute. We think that there can be no question but that the plaintiff was then at liberty, if he had seen fit, to have had those proceedings reviewed by certiorari. This, under the cases, would have been an appropriate remedy. People ex rel. Myer v. Adam, 74 App. Div. 604, 77 N. Y. Supp. 754.

Nevertheless the plaintiff took no such steps, but after the statutory time to review by certiorari had expired, and in June, 1914, after the railroads had entered upon the execution of the contract attacked, and after they had expended many thousands of dollars, began this action to restrain the defendants from carrying out the plans adopted and contract made.

It may well be that the plaintiff cannot now and at this time, by action, question the wisdom, feasibility, or legality of the plan adopted for the bettering of the terminal facilities of the railroad defendants. Although this objection may be perfectly good in so far as the general plan itself is concerned, nevertheless there would still remain the question whether certain provisions of the contract made with the railroads for carrying out the plan are legal and valid. We therefore, in the disposition of this case, prefer to deal with the questions involved the same as though a taxpayer's action were the sole and appropriate remedy to determine the issues presented.

[2] This action is based on section 1925 of the Code of Civil Procedure and section 51 of the General Municipal Law. Before entering upon a discussion of the many specific questions and objections raised to the legality and validity of the plan and contract in question, it is pertinent to inquire to what extent this court may go in reviewing the acts and determination of the terminal commission. I think it may be

safely asserted that this court has no right or authority to substitute its judgment for the judgment of the commission. It has no right or authority to adopt or modify any plan or contract that commission may make, even though it should be of the opinion that some other or different plan would serve the city and the railroads better than the one finally adopted. The court cannot assume to correct errors of judgment on the part of public officials, if such there are. The sole and only inquiry open to this court is whether, in adopting the plan and making the contract attacked, the terminal commission exceeded the power and authority conferred upon it, and in so doing are guilty of doing an illegal official act, and wasting the funds and property of the city of Buffalo.

Section 51 of the General Municipal Law provides that "an action may be maintained against" officers, agents, commissioners or other persons acting for and on behalf of any county, town, village, or municipal corporation in this state, "to prevent any illegal official act on the part of any such .officers," etc., "or to prevent waste or injury to * * * any property, funds or estate of such county, town, village or municipal corporation," etc. This and similar statutes in other states have been the subject of many judicial decisions. Judge Dillon, in his learned work on Municipal Corporations (5th Ed.) § 242, summarizes these decisions and the law on the subject as follows: ·

"Power to do an act is often conferred upon municipal corporations, in general terms, without being accompanied by any prescribed mode of exercising it. In such cases the common council or governing body necessarily have, to a greater or less extent, *a discretion as to the manner* in which the power shall be used. This discretion, where it is conferred or exists, *cannot be judicially interfered with or questioned, except where the power is exceeded, or fraud is imputed and shown, or there is a manifest invasion of private rights.*"

One of the leading cases in this state upon the subject is that of Talcott v. City of Buffalo, 125 N. Y. 280, 26 N. E. 263, where a taxpayer sought to enjoin the common council from substituting electric light for gas in one of the streets, and where it was charged the price to be paid was exorbitant, and the expense would be incurred without any additional convenience or benefit to the city or its citizens. The case came before the Court of Appeals upon a demurrer to the sufficiency of the complaint. The court said:

"The most that can fairly be said to be charged in the complaint is that the authorities of the city are using the power conferred by the charter unwisely and without due regard to economy. The question for our determination in this case, therefore, is whether a taxpayer can maintain an action to restrain the governing body in a city from official action, within its power and discretion and without any charge or allegation of fraud, collusion, corruption, or bad faith."

After considering the scope of the existing statutory action, Judge O'Brien said, at page 288 of 125 N. Y., at page 265 of 26 N. E.:

"We have referred to the origin of this statute, under which the action is brought, the title of the act of 1872 [Laws 1872, c. 161], and the language used by the Legislature, subsequently, when re-enacting it in 1881 [Laws 1881, c. 531] and 1887 [Laws 1887, c. 673], for the purpose of ascertaining whether it was intended to authorize a taxpayer to maintain an action

against the members of the common council in a city, and the administrative officers thereof, for the purpose of restraining officials acting within the limits and scope of their powers and discretion, such as is alleged in the complaint in this action, and we are of the opinion that it was not. Full force and effect can be given to the statute by confining it to a case where the acts complained of are without power, or where corruption, fraud, or bad faith * * * is charged. Any other construction would subject the discretionary action of all local officers and municipal bodies to review by the courts at the suit of taxpayers, a result which would burden the courts with litigation, without increasing the efficiency of local administration. Whatever evils may exist in the government of cities that are due to mistakes, errors of judgment, or the lack of intelligent appreciation of official duty must necessarily be temporary, compared with the mischief and inconvenience which judicial supervision in all cases would ultimately produce."

The general doctrine thus laid down has been repeatedly followed in numerous cases applying the rule to varying facts and circumstances. See Kittinger v. Buf. Traction Co., 160 N. Y. 377, 54 N. E. 1081; Rogers v. O'Brien, 153 N. Y. 357, 47 N. E. 456; Ziegler v. Chapin, 126 N. Y. 348, 27 N. E. 471; Schanck v. Mayor, 69 N. Y. 444; Govers v. Board of Supervisors, 171 N. Y. 403, 64 N. E. 193; Holtz v. Diehl, 26 Misc. Rep. 224, 56 N. Y. Supp. 841; Mead v. Turner, 134 App. Div. 692, 119 N. Y. Supp. 526.

In the case now under consideration the plaintiff alleges no fraud, collusion, or bad faith on the part of the terminal commission or the railroad defendants. Our inquiry, therefore, must be directed, not to the question as to the merits of one plan over another, or whether modifications of the plan finally adopted would be advantageous to the city or to the railroad defendants, but whether the terminal commission has exceeded the powers conferred upon it by the statute creating it, or has violated the Constitution of the state, or some other law, so as to render its action illegal and void.

Very many considerations may have suggested themselves to the members of the commission and influenced their judgment, which would not occur to a court. It is fair to assume that the terminal commission, composed of men of the highest character and business standing, after several years' study of the terminal situation and its demands, are more capable of making a correct solution of the questions committed to their judgment than the court itself. In any event, this court has no right or authority to disturb the careful and deliberate judgment and action of that commission, unless it has mistaken its powers and authority and violated the law.

[3] At the outset, it is urged by the plaintiff that no final plan for the improvement of the terminal facilities of the railroad was ever legally adopted by the terminal commission. It is contended that after the original and tentative plan had been filed, and a public hearing had thereon, the commission made certain modifications in those plans, and without any further public notice or hearing illegally adopted the modified plan as the final plan, for the carrying out of which the contract with the railroad was made. Whatever modifications were made in the plans were the result and outcome of the public hearing held. These modifications in no way changed the general plan, but were of comparatively trifling importance.

The plaintiff, however, urges that no final plan could be legally adopted before the terminal commission had called and given a further hearing on the plans as modified. We think the plaintiff is in error in this contention. Section 3 of the act provides:

"Sec. 3. Before adopting, altering or modifying any plan the commissioners shall give notice of their proposed action to all railroad companies which are to bear any part of the expense of the work for which such plan is made, and shall give them an opportunity to be heard. The commissioners shall make known the plan or modifications of a plan proposed to be adopted by them by filing such proposed plan or modification of a plan in the office of the chief engineer of the bureau of engineering in said city, and publishing a notice thereof daily in at least two of the daily newspapers published in the city of Buffalo for at least ten days before the first hearing thereon, and shall hear the railroad company or companies interested, and the city and any party interested by their respective representatives or counsel in opposition thereto, or in respect to any proposed change therein. Any railroad company interested, and the city, and any interested party, may at such hearing call and examine witnesses as to the feasibility and expediency of such proposed plan, and of any alteration or modification thereof which may be suggested, and of any new plan that may be suggested. The commissioners shall hear the proofs and allegations of the parties, reduce the testimony taken by them to writing, and they, or a majority of them, shall make a report in writing, wherein they shall state the plan adopted by them; the location of the railroad passenger and freight stations (which shall be located at or near their present location), yards and appurtenances and facilities to be used in connection therewith, and of the public and railroad approaches thereto, and of the streets, squares and public places contiguous or adjacent to said stations, yards, facilities or approaches to be used for said stations, yards and therewith connected facilities by the respective railroad corporations whose railroads enter or operate within the city of Buffalo, the change in the location or grades of the streets, alleys or lands owned by said city, and the change in the grades of existing structures carrying streets over or under railroads, which may be necessary in the judgment of said commissioners to secure to the public freedom from the obstructions of the streets of said city by railroads and adequate services for the transportation of passengers, freight and property in the use of the railroad tracks, switches, terminal stations or facilities. The report shall be filed in the office of the clerk of Erie county, together with the testimony taken before the commissioners, and such report shall thereupon become the plan for the part of the work provided for or referred to therein. The commissioners after adopting any plan or modifying or altering any plan shall give notice thereof to the railroad or railroad companies interested, and to the city, and shall designate the place where such plan or copy thereof will be kept on file for inspection and examination."

It will be noted that the statute provides that, upon public hearing called, any interested party may appear, and call and examine witnesses *"as to the feasibility and expediency of such proposed plan, and of any alteration or modification thereof which may be suggested, and of any new plan that may be suggested."* This testimony shall be reduced to writing, and said commission shall make a report in writing, *"wherein they shall state the plan adopted by them."* This *"report shall be filed in the office of the clerk of Erie county, together with the testimony taken before the commissioners, and such report shall thereupon become the plan for the part of the work provided for or referred to therein."*

It seems very plain to the court that the statute contemplates that the terminal commission, after the public hearing provided for, should take final action, and no new or further hearing is required; that

after such hearing the terminal commission were at liberty to adopt such modifications of the tentative plan proposed as the testimony and criticism of interested parties suggested as advisable and proper. The earlier portion of the section, providing that, *"before adopting, altering or modifying any plan the commissioners shall give notice,"* etc., evidently relates to alterations or modifications of a plan which had been once finally adopted, and does not require a further notice of hearing on modifications suggested after a general hearing such as was had in this case.

If hereafter, in this case, the terminal commission should propose to alter and modify the plan finally adopted, as stated in its report of September 6, 1913, then and in such case notice and public hearing is required by the statute. All the provisions of the statute must be read together, and when so read we can reach no other conclusion than that the terminal commission did not violate the statute in adopting a final plan as it did in this case. As stated in this connection, the changes or alterations made by the terminal commission from its proposed tentative plan related only to minor details, and did not modify any of the general features of the plan proposed.

[4] The plan as adopted by the terminal commission, and proposed to be carried out, provides among other things for the laying of an extra single track in Water street for a distance of about 350 feet easterly from the westerly side of Commercial street. The general plan seeks, as far as possible, to do away with tracks at grade where they cross Main street, and to substitute a crossing of this important thoroughfare by means of an overhead structure. The railroads have for years owned, and used in their freight business, warehouses extending from the westerly line of Main street to near the foot of Commercial street. Freight has been delivered to and taken from these warehouses by cars which have been run into or along the warehouse by tracks and sidings which cross Main street at grade. As these warehouses handle large quantities of freight coming from and delivered to lake carriers, the business done over Main street has been large. In order to obviate the doing of this business by trains passing over Main street at grade, the plan adopted by the terminal commission provides for serving this warehouse from the end opposite Main street—that is, from the Commercial street end—and this necessitated the leaving of a single track in Water street leading from the main track of the railroad to and into and along the warehouse in question.

The evidence given on the trial of this action demonstrated the necessity for the laying of this track if the great mass of freight business of the character handled in this freight house is no longer to be handled over tracks at grade crossing Main street. Indeed, the plaintiff produced on the trial two possible alternative plans differing from that adopted by the terminal commission, and in each of these suggested plans this single track referred to is laid down as one of the necessary means of carrying out the suggested alternative plans.

It is, however, urged on the part of the plaintiff that the terminal commission had no power or authority to give or provide for the lay-

ing of this extra track in Water street, and therefore the plan, and the contract with the railroad defendants to carry it out, rendered the plan and contract illegal and void. In other words, the plaintiff contends that the Terminal Act does not confer upon the commission created by it the power or authortiy to grant franchises to cross or lay tracks within streets. This contention involves a consideration of the entire act, the purposes sought to be accomplished by it, and the general powers conferred.

The terminal station commission was created by chapter 842 of the Laws of 1911. It was the result of many years' effort on the part of various mayors and public-spirited citizens to obtain relief from what was generally conceded to be disgraceful freight and passenger terminal facilities for the handling of traffic in this great city. Committees and commissions had been appointed over and over again, and accomplished nothing for want of power to carry out suggested plans, or to compel the city and the common carriers to agree upon proper means for accomplishing the objects sought to be obtained. As the result of these futile efforts, the citizens of Buffalo appealed to the Legislature, and the act of 1911 was passed, with the evident purpose that the commission thus created should have full power to deal with the terminal conditions in Buffalo and give the relief long sought.

The first section of the act "authorized and directed" the commissioners "to adopt from time to time *plans* for the purpose of relieving the congested condition of the railroad situation and terminals in the city of Buffalo, which plans shall require the railroads, or other transportation corporations operating within the city of Buffalo, to make such changes in the location or use of any existing tracks, switches, terminals, stations, or railroad facilities within said city * * * which in the judgment of said commissioners will secure to the public freedom from the obstruction of the streets of said city by railroads, and adequate services and facilities for the transportation of passengers, freight and property in the city." It is evident the Legislature intended to confer on this commission plenary power, not only to compel the railroads, but the city as well, to do what is requisite and necessary to accomplish the result desired, subject to the limitations placed on its exercise by the Constitution of the state and the provisions of the act.

The commission, in a large degree, represented the city, and were authorized to exercise powers formerly vested in other bodies and officials. To this end the seventeenth section of the act provides as follows:

"The provisions of any acts or parts of acts, including the charter of the city of Buffalo, which are inconsistent with this act, and in so far only as they are inconsistent with this act, shall have no application to the manner of creating this commission, or to the rights, powers and obligations conferred or created by or under authority of this act, or of any proceedings taken thereunder"

—saving that the Terminal Act shall in no respect interfere with or restrict, abrogate or modify the law creating and governing Public Service Commissions.

It is true that in express terms the first section quoted does not mention *extra* or additional tracks. Nor is there any restriction or prohibition against the commissioners providing for extra tracks, where the necessity exists. Nevertheless, the statute empowers and directs the commissioners to "adopt * * * *plans*" designed to carry out the purposes of the act. Such a construction should be placed on this statute as will enable the commissioners to perform the duties imposed on them, and fulfill the purposes for which it was enacted. Certainly it should not be so narrowly construed as to defeat these purposes. Nevertheless, if the plaintiff's contention in this respect were to prevail, it would operate, not only to defeat some of the main purposes of the general plan adopted, but probably would prevent the adoption and carrying out of any comprehensive plan or scheme for terminal relief.

When the statute empowered the terminal commission to adopt "*plans*" for the betterment of terminal facilities of transportation corporations, we are of the opinion that it empowered them to provide by such plans all the necessary details for making the plan or plans adopted workable. A "plan" necessarily involves the necessary tracks, switches, and other approaches required for the proper and successful operation and use of the stations, freight houses, or other terminal facilities to be provided. The greater includes the less; the whole, all the component parts.

We must conclude that it was the intention of the Legislature to confer upon the terminal commissioners power, in any "plan" they might adopt, to provide for extra track or tracks at grade in the public streets, in so far as necessary for the purpose of carrying out such plan; and to that extent they have the right to exercise the authority and powers before the passage of the act possessed by other officials. This view has already been expressed by members of other courts. Mr. Justice Foote, in his opinion in the case to test the constitutionality of the act in question, speaking for the Appellate Division, said:

"It appears to be the intention of this section that the commission shall be vested with a *power* in respect to compelling railroad companies to improve their terminals, similar to that vested in the State Public Service Commission, *and in addition* that the commission shall have *power over the city streets and city-owned property* to compel the city to make such changes and alterations therein as may be necessary to permit the enlargement and improvement of the railroad terminals, and at the same time relieve the streets of railway tracks and structures *as far as possible* in the interest of the city and its inhabitants." Hanrahan v. Terminal Station Commission, 152 App. Div. 355, 136 N. Y. Supp. 1005.

Judge Chase, speaking for the Court of Appeals in the action in which the constitutionality of this statute was involved (People ex rel. Simon v. Bradley, 207 N. Y. 592, 101 N. E. 766) among other things, said:

"In the case now before us the act under consideration gives to the terminal commissioners certain authority that had theretofore been vested in part *in city officers*. For the purpose of carrying out the provisions of the act the duties of the commissioners that are new are so associated and intermingled with the duties now devolved upon them that have heretofore existed in other officers that it is impracticable to wholly separate them."

The statute not only gave the commission power to deal with the subject of terminals and terminal facilities, but also with the abolishment of grade crossings of public streets. In exercising these powers, it is quite manifest that the commission would be compelled to make the best solution possible of a given situation. In many cases, if not all, the limited retention of some tracks at grade, as well as the laying of new tracks in or across streets, become not only proper, but necessary. It at least would be an unusual and peculiar case, where a comprehensive scheme for improving terminals is adopted, if it could be done without leaving some track at grade or substituting some other.

We have considered all the evidence and circumstances of this particular case, and are unable to discover that the terminal commission, in any particular, exceeded its power or authority, so far as the extra track in Water street is concerned.

[5] If we are correct in our view as to the right to authorize the laying of the service track in Water street, then an equal right exists to authorize the continuance of a single track across Main street for serving the freight house of the railroad company immediately west of that street. This is not a new track, but an old one already there. This track is designed to serve the freight house under extraordinary circumstances, when that freight house is crowded and it will be necessary for the proper operation of the freight business to detach part of a string of cars from its easterly end and carry them across Main street. The main service is to be from the west, and the use of the track across Main street only occasional. Instead of five' tracks across Main street at grade, there is to be but one, and this is to be used simply for emergency purposes. The evidence establishes a reasonable necessity. This plan, including the provision for the continuance of this single track at grade across Main street, was submitted to the Public Service Commission. In its report or decision, the State Commission said, in reference to this track:

"It is undoubtedly objectionable that any track should be left at grade. The commission has earnestly objected to the plan which provides for one grade track across Main street. Conference with the officers of the company has satisfied us that, at least for the present, it is unavoidable in the proper handling of the freight business of the company that at certain exceptional times during the lake season such a track must be available. Its use, however, at such times, can be regulated by the commission, so as to avoid the passage of trains at times of arrival and unloading of lake passenger boats."

As the act relating to the terminal commission deprives the State Public Service Commission of none of its powers, but expressly preserves them, we may safely assume that commission will so regulate the use of the track across Main street as to minimize any dangers incident thereto.

[6] The plaintiff, by the same argument by which he challenges the right of the plan to provide for a service track in Water street, also challenges the provision in the plan for placing a support in the center of Main street to carry the girders for the overhead track. The terminal commission were of the opinion the plan adopted was prefera-

ble to one calling for a single girder, which in case of a single span would have to be some 11 feet in depth. We have no quarrel with that conclusion, but the plaintiff's counsel contends that such a structure has been condemned by the Court of Appeals in the case of D., L. & W. R. Co. v. City of Buffalo, 158 N. Y. 266, 53 N. E. 44. Judge O'Brien, speaking for the court, upon a motion for a reargument of the case (158 N. Y. 478, 53 N. E. 533), said:

"The Railroad Law [Laws 1850, c. 140] and the charter undoubtedly authorize the municipal authorities, by resolution or otherwise, to enter into an agreement with a railroad upon a plan for crossing a street at an elevation or otherwise, and when the railroad acts upon the agreement thus made and constructs the crossing accordingly, it can then insist upon maintaining its structure under legislative authority; but the difficulty in this case is that, in view of the numerous contradictory and conflicting acts and resolutions of the city authorities, it cannot be said that such an agreement was ever made. If the plaintiff had made out a clear case of consent on the part of the city authorities to the construction of the bridge in question in the manner that it has been constructed, the plaintiffs' case would stand in a different light."

The case, instead of being an authority in support of the plaintiff's contention, is in fact of just the opposite import, as we read and understand it.

[7] Clause 8 of the contract with the railroads relates to the construction of a new fireboat slip for the city, in the place and stead of the present one, over which the tracks of the railroad are to run under the plan for the new railroad terminals. The new slip is to be constructed a short distance easterly from its present location, and to be larger in size, and provided with a concrete dock. The railroad agrees to pay, in addition, a stated sum to the city as the estimated cost of installing new water mains and intakes to be used in connection with the fire tug, if the city shall elect to accept said sum and itself install such mains and intakes. If, however, the city shall not so elect, then the railroad agrees to install such pipes and intakes without expense to the city. It is further provided that the land embraced in the old slip is to be exchanged for the lands embraced in the new slip; that such parcels are to be appraised in the manner provided in section 7 of the act, and if, on such appraisal, the value of the parcel to be acquired by the city shall exceed in value the parcel to be acquired by the railroad, the railroad will release to the city any excess in such valuation. In short, the change in the location of the slip shall be without expense to the city, and by the arrangement the city will thus acquire an enlarged and improved fireboat slip. The advantage is clearly on the part of the city, and yet this provision of the contract is challenged by the plaintiff as an unlawful excess of power, not conferred upon the terminal commission.

A somewhat similar question is raised by the plaintiff as to the clause of the contract by which a triangular shaped parcel of land, immediately west of Main street and bounding on the Buffalo river, is to be conveyed by the Lackawanna Railroad to the city of Buffalo. It is claimed this involves an unauthorized exercise of power by the termi-

nal commission. The evidence shows the following facts: The city of Buffalo had laid and maintained in Washington street, and running to the Buffalo river, a water main with proper connections and intakes, so arranged that they could be connected with fire tugs lying in the river opposite the foot of Washington street, and streams of water for the extinguishment of fires be pumped through the main to the business section of the city. By the plan for the new terminal, Washington street, extending from Ohio street to Front street, so called, is to be closed, and the passenger station of the railroad company is to be erected upon and over this portion of Washington street to be closed. This necessitates that a new water main and intakes be constructed elsewhere for the operation of the fire protection of the city. This is provided for by the plan and contract, by the railroad conveying to the city the triangular parcel of land just west of Main street. The new mains and intakes are to be placed on this land, and, as the parcel has a river frontage, a fire tug is enabled to lie alongside and pump water into the main. It is thus manifest that the plan, so far as this change is concerned, is not only proper, but a necessary one. It might be noted that by the provisions of the contract, inasmuch as the city of Buffalo was the owner of the fee of Washington street, the value of the portion of the street taken for terminal purposes was to be appraised by a commission as provided by section 7 of the act, and this triangular shaped parcel to be conveyed by the railroad to the city was also to be appraised by the same commission. This has been done. The cost of constructing the new main and intakes was to be borne entirely by the railroad company.

In addition to the propriety and necessity of providing a place for the water main and intakes for the fire lines and their operation, the acquisition by the city operates to widen Main street at its lower terminus, and to broaden the approach to the passenger station to be erected on the easterly side of Main street. During the summer season, many excursionists visit the foot of Main street to take boats running from the dock at the foot of the street, so that, independent of the question of water mains and intakes, the deeding of this triangular parcel to the city serves a useful purpose in widening the public approaches at this point.

We are of the opinion that the terminal commission acted clearly within the authority conferred upon it by providing in the plans and contract for the relocation of the fire tug slip, and also for relocating the water mains and intakes from Washington street to the triangular parcel in question. We think the statute anticipated and provided for contingencies such as were presented and have been briefly outlined. By the first section of the act the commission was directed to adopt plans requiring the railroad to make necessary changes in the location of station and tracks, and also requiring "the city to make such changes in the location * * * of the streets, alleys or lands owned by said city," which would secure adequate terminal facilities. By section 3 the commission was required to make a report in writing, stating the plan adopted, etc., and "the change in the location or

grades of the streets, alleys or *lands* owned by said city," etc.   By
section 5 the commission was authorized to—

"agree upon behalf of said city with any company for the change of location or grade of any street, alley or *public place* which may be necessary, and may agree with said companies for the *exchange* or sale of lands owned by said city at a price therefor to be determined as hereinafter provided."

Section 7 provides for an appraisal to determine the value of lands
to be taken or exchanged and prescribes the mode of procedure.   By
section 9 of the act the commissioners—

"are authorized and empowered to acquire any lands in the city of Buffalo, to close or alter any street, alley or public place, to change in or remove from any such street, alley or public place any gas or water pipes, sewers, conduits or other objects, or change the grade of any street which they shall decide  *  *  *  necessary for the purpose of carrying out the plans and contracts hereby authorized," etc.

We are unable to discover, in view of the provisions of these sections, that the commission exceeded its authority in providing, as it did, for the relocation of the fire tug slip, or the relocation of mains and intakes on the triangular parcel in question.

[8] In our opinion, the contract is not rendered invalid by including in the plan and contract the provision in reference to the small triangular piece of land on the northeasterly corner of Main and Ohio streets.   It appears from the evidence given on the trial that the triangle in question has been a part of Ohio street for upwards of 30 years.   By the contract the city agreed to close Ohio street, and deed to the railroads Ohio street as closed.   On the other hand, the railroad, by section 5 of the contract, specifically included this small triangle as one of the parcels which the railroads agreed to deed to the city.   This triangle, by the plans, clearly appears to form a portion of what will be new (or relocated) Ohio street when laid out and opened.

It was undoubtedly an oversight and mistake to have included this triangle as one of the parcels to be appraised by the appraisal commission subsequently appointed under section 7 of the act, as provided in the contract.   Hon. Albert Haight was named by this court as the head of that commission, and it was conceded on the trial of this action by the counsel for the city of Buffalo that upon the hearing had before the appraisal commission the error was recognized, and no testimony was offered as the basis of any award.   It was properly omitted from consideration on that proceeding.   The counsel for the plaintiff, however, was not ready on this trial to make the concession which the city corporation counsel frankly made.

Inasmuch as this plaintiff is prosecuting this action as a taxpayer for the alleged benefit and interest of the city, it hardly seems to lie in his mouth to assert the contrary to what the city concedes to be the fact, especially where the corporation counsel, in other respects, is in this action acting in harmony with the plaintiff.   Be that as it may, we can see that what appears to be inconsistent provisions in the contract as to this small triangle has and can operate to work no wrong to either party.   If the contract were to be carried out to the letter, it

would leave the city and the railroads in exactly the same position as they would be if the contract had been entirely silent as to this small triangle.

[9] By the plan adopted by the terminal commission, and by the contract entered into with the railroads, it is provided that certain public streets, or portions thereof, shall be closed and abandoned as public streets. Among the streets so to be closed are portions of Prime street, Ohio street, and those portions of Washington, Indiana, Illinois, Mississippi, Liberty, and Columbia streets, extending from Ohio street and Elk street (which is practically an extension of Ohio street) to Front street so called. In the case of all streets where the fee of the street is vested in the city of Buffalo, the contract with the railroads provides for the appraisal of the value of the land embraced within such streets in the manner provided by section 7 of the Terminal Act; and for such land this city is to be compensated by the railroads. As to the other streets closed, where the fee is not vested in the city, the contract provides for no compensation to be paid to the city. Such are the stub ends of Indiana, Illinois, Mississippi, and Columbia streets, and Front street, so called, extending easterly from Main street to a point easterly of Columbia street.

It is contended on the part of plaintiff that the city is entitled to compensation for the surrender of the public easements in such of the streets as are to be closed and turned over to the railroad companies, to which the city does not own the fee. In other words, the contention of the plaintiff is that the city of Buffalo owns property rights of value in such streets, and the terminal commission had no right or authority to surrender these rights without the railroads paying for the same, and to do so violated that provision of the Constitution of the state providing:

"No county, city, town or village shall hereafter give any money or property * * * to or in aid of any individual, association or corporation." * * * Article 8, § 10.

It becomes important that there should be a clear understanding of what rights the city of Buffalo has in streets where it does not own the fee. We think it may be safely asserted that the city, as such, has no property interest whatever in such streets. Whatever rights to travel or use the streets exist are rights which belong to the public at large, as distinguished from any right the municipality itself has or had.

[10] The construction and maintenance of public highways is primarily one of the great functions of the state, and while their care and maintenance may be committed to the municipality, the right to travel over and use them belongs to the people at large. We speak of the city's streets, but they remain, nevertheless, the state's highways, subject to legislative control. Even where the fee of the street is owned by the municipality, nevertheless the street is, in law, held in trust for the public at large. The property rights of a municipality in public streets have been the subject of judicial decision in a number of well-considered cases in the courts of this state, and it has been held that even the ownership by a municipality of the fee of

a street is not property protected by the clause of the Constitution above quoted.

In People v. Kerr, 27 N. Y. 188, the question was distinctly before the Court of Appeals and squarely decided. The city of New York owned the fee of a certain street, over which the Legislature had authorized the construction of a surface street railway. The city claimed it was entitled to compensation for the additional burden imposed upon the fee of the street. The court held, after considering the question of the city's ownership, that the municipality's title to the fee of the street was not private property, but was in trust for the people of the entire state, and that the Legislature had the right to divert the property to another public use, without compensation to the munici‑ pality. The language of the court expressed in its opinion in that case is so illuminating on the subject that we venture to quote at length:

"So far as the existing public rights in these streets are concerned, such as the right of passage and travel over them as common highways, a little reflection will show that the Legislature had supreme control over them. When no private interests are involved or invaded, the Legislature may *close* a highway and relinquish altogether its use by the public, or it may regulate such use or restrict it to peculiar vehicles or to the use of particular motive power. It may change one kind of public use into another, so long as the property continues to be devoted to public use. What belongs to the public may be controlled and disposed of in any way which the public agents see fit. * * * Whatever may be the quantity or the quality of the estate of the city of New York in its streets, that estate is essentially public and not private property, and the city, in holding it, is the agent and trustee of the public, and not a private owner for profit or emolument. It is not material whether the public, for whom the city is vested with this title, consists of those who may, from time to time, be citizens of New York, * * * although it might, I think, be shown that a trust to keep and maintain a highway is not for the benefit of the inhabitants of the adjacent city alone."

Judge Wright, in his opinion in the same case, said:

"The streets in question are not owned by the corporation of New York. The corporation cannot sell or dispose of them, or * * * divert·them to private use. Any and all title or interest which the city has in them is held for public use, is public property, and not private or municipal. * * * I am clearly of the opinion that the city corporation has no property in the streets of a character to be protected by the constitutional limitations upon the right of eminent domain. It is, perhaps, unnecessary in this case to consider the question whether, in other streets of the city not opened under the act of 1913, the corporation has a property in them to be thus protected; but, if it were, my conclusions would be the same. Whether the fee or ownership of the bed of ancient streets was originally vested in the government, or the land was taken and condemned for public use under colonial or state acts, upon paying to the proprietors a compensation for the soil or easement, or was voluntarily ceded to the public, it seems plain to me that the corporation has no property in the soil of the streets, to be constitutionally protected against the acts of the state in regulating their use. It cannot be pretended that the absolute title and estate in the land embraced within the streets has ever been granted to the corporation from any source. Whatever estate or interest it holds, either conferred by the Dongan charter or by the state, is in trust for the public use. It is not a trustee for the inhabitants of the city alone, but for the whole people. The corporation may exercise the trust, or it may have control over the public streets, or the power of regulating their use, *but that is not corporate property, nor has the corporation, or any of its corporators, a private interest therein, or a right to derive profit therefrom.* * * *

"The interest in the use of streets being publici juris, the *power of governing and regulating such uses is vested in the Legislature, as the representative of the whole people.* It is a part of the governmental or political power of the state, *in no way held in subordination to the municipal corporation.* *  *  *  I know of no restraint upon legislative action, unless it can be found in the Constitution. .*  *  *  The city corporation, as feeholder of the streets, in trust, for public use as highways, is but an agent of the state. Any control which it exercises over them, or the power of regulating their use, is a mere police governmental power delegated by the state, subject to its control and direction, and to be exercised in strict subordination to its will. The corporation, as such, has no franchise in connection with the use of the streets for the transportation of passengers. Whatever power or authority it possesses in respect to the carriage of persons for hire was derived from acts of the state Legislature, which power may be resumed by the grantor at its pleasure."

The case of People v. Kerr, 27 N. Y. 188, has been frequently cited with approval in later decisions. It was so cited in People v. Tax Commissioners, 174 N. Y. 443, 67 N. E. 75, where the following language was used:

"A highway may be local, but the title thereto is not, for whether a fee or an easement it is held in trust for the people at large, represented by the state, which has control of the streets and of the erections therein."

In the case of City of New York v. Rice, 198 N. Y. 128, 91 N. E. 284, 28 L. R. A. (N. S.) 375, again citing People v. Kerr, the court said :·

"The ownership by the city of the fee of the land in the street is impressed with a trust to keep the same open and for use as such. The trust is publici juris, that is, for the whole people of the state, and is under the absolute control of the Legislature; in which body, as representing the people, is vested power to govern and to regulate the use of the streets. There is no right in the city to use its property therein, as it might corporate property, nor otherwise than as the Legislature may authorize for some public use or benefit."

In Craig v. Rochester City & Brighton R. R. Co., 39 N. Y. 404, the court said in its opinion at page 412:

"In People v. Kerr, one of the cases cited, which was subsequently carried to the Court of Appeals, and is reported in 27 N. Y. 188, the decision was put upon the ground that the fee of the street, as against the plaintiffs, was held by the corporation of New York City, and that the plaintiffs, other than the people, had no property in the land forming the bed of the street in front of their respective premises, to be protected by the constitutional limitation upon the right of eminent domain."

This doctrine was reaffirmed in Peck v. Schenectady R. Co., 170 N. Y. 298, 63 N. E. 357.

Another important case is that of Matter of Grade Crossing Commissioners, 66 App. Div. 439, 73 N. Y. Supp. 10, where the Appellate Division held that the city of Buffalo was not entitled to compensation for the taking of the fee of a street owned by the city of Buffalo for use by a railroad in connection with a grade crossing improvement. Presiding Justice Adams, in the course of his opinion, said :

"It therefore only remains to determine how much consideration shall be given to the contention of the city that it is entitled to recover compensation of the respondent for any injury done to parcels 76 and 77 in consequence of the change of the grade of Hamburg street. For reasons which we shall proceed to state as briefly as possible, we do not deem this contention well

founded. In the first place, it is not in accord with the well-recognized principle of law that, where the fee of a street is in a municipality, the same is held in trust for public purposes, and the municipality can therefore recover no damage, either direct or consequential, for any new use to which such street may be put, unless the same is authorized by the Legislature"— citing People v. Kerr.

It should be borne in mind that in all the cases above cited the fee to the land in the street appears to have been vested in the municipality, while in the case now before us for disposition the city of Buffalo makes no claim to the fee of the streets to be closed. As to all streets to be closed, where the fee is vested in the city, the contract attacked expressly provides for compensation by the railroad defendants. It is only where the city does not own the fee that there is provided by the contract a closing of the streets without an appraisal and compensation.

The only right the public have in such cases is the right to use such street for street purposes, and this right principally is the right to pass over them; and this right is vested, not in the municipality as a corporation, but in the people of the state at large. If any compensation for the closing of such streets were to be made, it should go, not to the city, but to the state, or to the people at large, to whom the right belongs, unless the Legislature has, by some statute, expressly provided other-wise.

[11] It is urged by counsel for the plaintiff, and by the corporation counsel of the city, that the Terminal Act provides and contemplates that compensation should be made the city for the right to close the streets under discussion, even though the city did not own the fee. We do not so read or understand the act. By section 9 of the act it is provided:

"The commissioners are authorized and empowered to acquire any lands in the city of Buffalo, *to close* or alter any street, alley or public place, to change in or remove from any such street, alley or public place any gas or water pipes, sewers, conduits, or other objects, or change the grade of any street which they shall decide shall be necessary for the purpose of carrying out the plans and contracts hereby authorized, and the proceedings provided for in section seven * * * shall be applicable for the purpose of acquiring *title to any lands* necessary to be taken."

Section 7, as we have previously seen, provides for the method of ascertaining the value of different parcels of land to be conveyed to the railroad by the city, or to the city by the railroad, upon an exchange of properties. The appraisal commission appointed pursuant to this section is to ascertain "*the fair market value of any lands owned by the city of Buffalo, to be exchanged or sold by it.*" It is quite manifest that compensation is to be made only where the city is the "*owner of lands*" to be exchanged. There is not, in the entire act, from beginning to end, a suggestion that the city is to be compensated for easements belonging to the people at large. We can discover nothing, even by implication, in the statute justifying the inference that it was contemplated the city should be compensated for easements which it did not own.

To summarize the law, as we understand it and gather it from the decided cases, the city had no property right in the streets proposed to be

closed, where the fee of the land is not vested in the municipality. Such right belongs to the people of the state at large. To close such streets is no violation of the state Constitution, forbidding a city giving its property to a corporation without compensation. Such streets and highways are subject to legislative control, and may be discontinued altogether, provided by so doing private rights are not violated. The Legislature, by express authority conferred by statute, has authorized the terminal commission to close these streets when in their judgment it is necessary so to do, to carry out the terminal plans adopted by it. The terminal commission has acted upon that authority and closed the streets in question.

[12] The legal operation of the closing of the streets is simply to relieve the land, within the streets closed and abandoned, of the public easements which have theretofore existed in them. The owners of the fee of the streets, whoever they may be, then become the owners of the land, discharged of these easements. 37 Cyc. 192; Tinker v. Russell, 14 Pick. (Mass.) 279; Commonwealth v. Western, 1 Pick. (Mass.) 136; McQuigg v. Cullins, 56 Ohio St. 649, 47 N. E. 595. The rule is stated in 37 Cyc. 202:

"That when the highway is discontinued or abandoned the land becomes discharged of the servitude, and the entire and exclusive enjoyment reverts to the proprietor of the soil, except where the fee to the highway has passed to the public."

See cases there cited, among them the following New York cases: Mangam v. Sing Sing, 11 App. Div. 212, 42 N. Y. Supp. 950; Jackson v. Hathaway, 15 Johns. 447, 8 Am. Dec. 263.

[13] The evidence shows that the Lackawanna Railroad is the owner of the land between the present location of Ohio street and the Buffalo river lying easterly of Main street and extending to Liberty street, including the fee of Front street and the fee of the stub ends of Illinois and the other cross streets running to Front street, so called, with the possibility that there may be some small outstanding interest of third parties in the fee of some of the stub ends of some of these streets extending to Front street proposed to be closed.

In this action we do not think it necessary for the court to decide whether or not any such interest is in fact outstanding. It is sufficient to say that such interest, if any exist, is not vested in the city of Buffalo. If the railroad does not now own the entire and complete title to all the property upon which it is proposed to construct its station and other terminal facilities, then it will be necessary for the railroad to acquire title either by purchase or by condemnation. In any event, such questions can in no way affect the outcome of this litigation. In this connection it would not be out of place to say that a claim is made that the city does own title to or an interest in the fee of Liberty street, which will be considered later by the court.

[14] We have heretofore seen that the control of public highways is vested in the Legislature, and that the power to close streets rests with that body as the representative of the state, and that this power may be delegated by it to public officials acting for it. It is claimed by the plaintiff, however, that this power cannot, or should not, be exer-

cised in the case of Front street. No small portion of the plaintiff's efforts have been directed to the proposition that, while the terminal commission might close other streets, yet so far as Front street is concerned this cannot legally be done.

We are unable to discover any good, sufficient reason why the same power which may exist in the one case does not exist to an equal degree in the case of Front street, so called. It is argued that because Front street, so called, runs along the margin of Buffalo creek, or harbor, and over the docks built along that water, that an exception to the general rule exists under such circumstances, and that at least to close this street under all the existing conditions would be illegal, and that to do so constitutes such an abuse of power or discretion as renders the act of the terminal commission invalid and void, or a waste of public property within the meaning of the Taxpayer's Act. This necessitates an extended inquiry into the history and status of this street, over which there has been in the past no little controversy and discussion.

It is claimed on the part of the defendants, saving the city, that Front street has long ceased to exist as a public street, and has been abandoned for highway purposes. A large amount of documentary and oral testimony was introduced on the trial of this action tending to sustain the contention of the various parties. It will be noted that, in the contract which is attacked, Front street is referred to as "Front street, so called." No other street mentioned in the contract is so designated, and the words used to describe the street at once suggest a possible doubt in the minds of the parties to the contract of the real legal status of the "so-called" highway. Those familiar with the prior litigation in the courts over the existence of this street as a street will at once appreciate the significance of the term used, and why it is so referred to in the contract.

The dispute between the city of Buffalo and the Lackawanna Railroad, which resulted in an action which was carried to the Court of Appeals and is commonly known as the "Front Street Case," where the judgment of the lower courts was reversed and a new trial ordered, is well known. See City of Buffalo v. D., L. & W. R. R. Co., 190 N. Y. 84, 82 N. E. 513, 16 L. R. A. (N. S.) 506; Id., 68 App. Div. 488, 74 N. Y. Supp. 343, affirmed in part 176 N. Y. 594, 68 N. E. 1115, affirmed 178 N. Y. 561, 70 N. E. 1097. The new trial ordered in 190 N. Y. 84, 82 N. E. 513, 16 L. R. A. (N. S.) 506, was never had. Undoubtedly the parties to the contract had the contentions of the city and of the railroads in mind when they drew this contract, and that, in order to save any question which might arise in the future as to whether Front street is or is not a public street, the terminal commission undertook to formally close the street.

It is contended by the plaintiff, however, that this action on the part of the terminal commission is such a formal recognition of the existence of Front street as a public street that all parties are now estopped from questioning its legal existence as a public highway, and that for the purpose of this action the court must assume that such a street actually and legally exists. If it does not, all the contentions made in its behalf by the plaintiff necessarily fall to the ground.

In the view the court takes of this case, it matters little, however, as to the general result, whether Front street is to be deemed an actual public street or not, for the legislative act under which the terminal commission exists expressly confers upon the commission full power to close all streets when in their judgment such action becomes necessary to carry out its plans for the improvement of the terminal facilities of the railroad defendants. Let us, however, examine into the facts of the case, with a view of ascertaining the nature and extent of the public's interest in the street in question. The record is so voluminous that in the compass of an opinion we can only outline the salient features.

It appears that early in the last century the Holland Land Company made and filed a map of the village of New Amsterdam, showing an open space along the northerly bank of Buffalo creek east of Main street, which is claimed to be Front street. It does not appear that this area, extending from Main to Michigan street, was ever worked or traveled. About the year 1837, or prior thereto, wharves were constructed along the river by private enterprise. In June, 1826, a resolution was passed naming the street on the margin of Big Buffalo creek, from Main street, easterly, "*Ohio street.*" In May, 1829, the Holland Land Company executed deeds to the owners of all lots situate upon the alleged street, between Main and Michigan streets, wherein and whereby the Holland Land Company conveyed to such owners all the premises lying between the southerly line of their respective lots and the Buffalo river, in which deeds no reference is made to the existence of this so-called street. Probably under the rule of law laid down in Johnson v. Grenell, 188 N. Y. 407, 81 N. E. 161, 13 L. R. A. (N. S.) 551; Id., 112 App. Div. 620, 98 N. Y. Supp. 629, the conveyances of the lots abutting in the street carried with them the fee of the street to the margin of the river. However this may be, the owners of the lots abutting on this street became vested with the fee of the land forming the bed of the street, and the Lackawanna Railroad, by purchase and conveyance from such prior owners, has become and is now the owner of lots 74, 75, 76, 77, and 78, and of all the land lying between the southerly line of the present Ohio street and the river, and over which the present docks are constructed. There is no claim that the city itself ever acquired any interest in or ownership of the fee of this street.

On March 20, 1830, the trustees of the village of Buffalo, acting as commissioners of highways, passed a resolution closing the street. Undoubtedly the village trustees assumed to act pursuant to chapter 152 of the Laws of 1826. On the same day, and by separate resolution, the village trustees passed another resolution, the latter portion of which reads as follows:

"Resolved, also, that all those persons to whom deeds have been executed by the Holland Company be entitled to receive said deeds on their executing to the trustees their bond, conditioned to construct a road two rods in width along Big Buffalo creek in front of their lands *at such times as they shall occupy their lots with buildings.*"

Of course, the village trustees had no power to impose any such condition upon lot owners as to their acceptance of deeds from the Holland

Land Company.   These public records, however, show that Front street, so called, was· formally abandoned by the village authorities, and that they had attempted, by resolution, to provide for the laying out of a new street by the lot owners at some time in the future when they should occupy their lots by buildings.  On March 10, 1832, a similar resolution was passed as to certain property owners.  There is an absence of proof that these owners ever in fact improved their property or built this road; nor can we find any statutory authority for village authorities or highway commissioners laying out a street by any such method or resolution.  It would appear that the original action of the trustees passed in 1830, discontinuing the road, was considered irregular, and accordingly on the 6th day of April, 1832, a resolution was passed reciting the alleged irregularity and reciting:

"That so much of the street as was originally laid out along the banks of the Big Buffalo creek from Main to Martin (Michigan) street as not covered by the present Front street be and the same is hereby discontinued in pursuance of the prayer of this petition."

In this connection it should be noted that the original street closed by this resolution was one chain, or 66 feet, in width, whereas the new street contemplated to be opened was to be two rods, or 33 feet, in width.  It is doubtful whether the street contemplated in the prior resolutions was ever in fact laid out or existed as a street.  Beyond doubt, the space in question had been built over by the owners of the land, and covered with wharves and docks; for on December 27, 1837, a resolution was passed as follows:

"Resolved, that all the docks and wharves on the north side of the Big Buffalo creek in the city, commencing at the Evans slip and extending up the creek to the bridge, shall hereafter be built, constructed, and repaired or rebuilt under the direction of the common council *as a public highway;* that the city surveyor, with the assistance of the street commissioner, be and he is hereby directed to survey and ascertain the front line for the said docks and wharves on the said creek, and their elevation or height, fixing the line where docks now are or heretofore have been erected as nearly as may be at the fronts of those docks, and ascertaining and making the height or elevation for said docks and wharves at said front line at least six inches above where the highest floods of water in said creek during ·the year 1837 has reached.

"And it is. hereby further resolved, that the standing committee on streets and on wharves and on public grounds be and are hereby appointed a special committee, and that as such committee they are directed to prepare and report to the next meeting of the council a plan for the erection of said docks and wharves and the raising and improving of the streets near said docks and wharves in the First ward of the city."

It was not until the following year that the city of Buffalo was given any jurisdiction over the wharves of the city.  See section 13 of chapter 63 of the Laws of 1838, passed March, 1838.  This resolution was relied on by the city to show that Central Wharf (west of Main street) was a public highway; but it was held that a highway could not be opened in this manner, and that the resolution was invalid and worthless.  City of Buffalo v. D., L. & W. R. R. Co., 68 App. Div. 495, 74 N. Y. Supp. 343, affirmed in 178 N. Y. 561, 70 N. E. 1097.  By the act of 1838 it was provided:

"That the common council of said city shall have power to cause any wharf or dock *in* said city to be built, altered, repaired or rebuilt, and to regulate and direct the building, altering, repairing or rebuilding to be assessed upon the real estate benefitted thereby, in the same manner as is by this act provided for making and collecting local assessments."

The act is applicable to both public and private wharves, and refers to all docks "in said city." Whether the statute was legal or illegal in its provisions, it could not operate to convert private property into a public street. In speaking of this statute and of its effect, Mr. Justice Spring said, in his opinion in City of Buffalo v. D., L. & W. R. R. Co., 68 App. Div. 495, 74 N. Y. Supp. 348:

"After this there were many resolutions passed by that body regulating the construction and reparation of these docks. It early began to assert dominion over private docks, to the extent of requiring their proper maintenance and repair. Even though owned by individuals, these wharves were quasi public in character, in that they were used largely by the public, and it was eminently proper that the municipal authorities should exercise supervision over them. We accordingly find frequent resolutions relating to the regulation of these docks, which action was entirely compatible with the ownership thereof by the abutting owners, and which was intended for the better protection of the people who went upon this property. As a sample of these resolutions, one was passed December 22, 1837, directing that 'all the docks and wharves on the north side of the Big Buffalo creek' in this vicinity 'shall hereafter be built, constructed and repaired or rebuilt under direction of the common council as a public highway.' The location of the front line and height of these docks is committed to the city surveyor and the street commissioner. If this resolution was in the exercise of the authority of the common council to supervise the rebuilding or repair of these docks for the public welfare, it was within its power. If, however, by formal resolution, that body attempted to appropriate the property of the individual for a street or for the use of the public, there was no warrant for the resolution, for the common council possessed no more power than a highway commissioner to wrest property from individuals. The charter (section 41) provided a way by which a street could be established. Again, on April 19, 1838, a resolution was passed by the common council directing a committee 'to inquire into the propriety of having the *private* docks on Buffalo creek repaired,' which is a recognition of individual ownership of these wharves."

From this time on we find many resolutions of the common council providing for the repair of docks and wharves built along the river where the so-called Front street runs, but in all instances the costs of such repairs were assessed to and paid by the upland owners. The docks and wharves were built and maintained by such owners at their own expense, and for their own use as private wharves and docks. They collected rents or wharfage from those using them, and the right to so do has never been challenged by the city or by any one else for all these years. There is evidence that many years ago the council did undertake to prescribe by ordinance a tariff for the right to dockage opposite the foot of certain streets, such as Washington, Illinois, and other streets running to the north line of so-called Front street. Whether such tariffs were ever enforced does not appear, but at best such ordinance was at least an implied recognition of the private character of the docks and wharves opposite all the rest of the property. The land underneath the docks had, to a large degree, disappeared, either by the natural erosion of the river, or by the falling away of the soil caused by dredging, so that the waters of the river the whole

length of the docks extended under them for a considerable distance, and in some places nearly their entire width.

We are unable to discover in this case evidence of any legal opening or formal dedication of this street, as a public street, either by the public authorities or by the upland owners. The title of the upland owners extended back from the river or creek to Ohio street, so that there was always access to their property from their Ohio street frontage. If Front street is to be deemed a public street, it certainly was never worked by the public authorities in the manner that streets are ordinarily worked. There was no grading, no paving, no sidewalks or curbing. Owing to the nature of the case, this, of course, was impossible. It was planked like wharves and docks usually are, such planking being placed on stringers or timbers of sufficient strength to support the flooring and freight which might be piled on it for transportation by vessels.

We are unable to find, in any of these resolutions, anything inconsistent with the ownership and use of the docks and wharves opposite lots 74, 75, 76, 77, and 78, as purely private docks. It is very doubtful whether the abutting property owners ever regarded Front street, so called, as a public street. At least, their use of it, or portions of it, has been quite inconsistent with the theory that the street was a public highway. For instance, two large grain elevators, the Wilkinson and the Wells, were erected and operated for many years on a portion of the property lying between Ohio street and Front street, but the elevator tower to each of these elevators was built upon and over this so-called Front street. The face of these towers came up flush, or nearly so, with the face of the dock over which they were constructed. It is true, however, that an opening from 15 to 16 feet in width was left under these elevator towers, so that a wagon could pass under and through the towers in question. Nevertheless, when the towers were in operation elevating grain, the machinery and tackle necessary to do so obstructed the openings to such a degree that wagons could not pass through, although travelers on foot could manage to pass.

Further on, opposite what is known as the Ensign property, the street was covered by sheds, and the space freely used for the unloading and handling of freight in connection with a lake line of steamers, and the evidence shows that large quantities of such freight were permitted to remain under the sheds for considerable periods of time. Further on the street was intersected by what is known as the Clark & Skinner Canal without any bridge over it. Just beyond this canal, for years, were built two grain elevators, known as the Sternberg elevators, one of which, at least, was built entirely over the so-called Front street, entirely obstructing any passage whatever over it as a street. Witnesses were called, who had been acquainted with the locality for 50 years or more, who testified that they had never seen vehicles drive along or over the street, and some of whom testified they had never heard it called a street; the usual designation by which it was known being "the dock."

On the other hand, it appears that, with the exceptions noted, what is called Front street remained open, and travel over it was unobstructed;

that vehicles did occasionally pass over and along it. These vehicles were generally those having some immediate business upon or along the docks, and consisted principally of freight or delivery wagons going there to haul freight to or from the dock, or to deliver supplies to lake craft which might be lying at the wharves. It was also used to some extent by busses and carriages taking passengers to or from steamers plying the lakes. Of course, the activities of the dock attracted many people, as was natural, and those visiting the harbor, or having business along or in its vicinity, were accustomed to pass up and down, and along these docks on foot, without hindrance, molestation, or protest on the part of any one. It further appears that at some time in the past, but just when is not shown, the city, at·the junction of Front street and Main street, erected a post with a street sign of "Front street" upon it. It further appears, by some of the deeds of conveyance forming the chain of title to the property abutting on the dock, that reference is made to Front street, and the conveyances are made subject to the public rights therein. Numerous resolutions of the common council of the city refer to Front street.

This, in a general way, describes the nature and extent of the use of so-called Front street for highway purposes; but at the same time it is argued with great force on the part of the defendants that none of these uses were inconsistent with the use of the wharf or passageway as purely a private dock, and the continued use in the manner described, without let or hindrance, was not a recognition of any right in the public to use the wharves for highway purposes. A mere license or permission should not be turned into a right.

[15] If the plaintiff in this case has established this as a street at all, it must, we think, be on the doctrine of prescription. Long and undisputed and uninterrupted use of land for travel may establish a highway by what is termed prescription. Whatever right the public has in Front street must, in my opinion, rest entirely upon that theory, and that alone, and not upon any shown opening or dedication of it to the public by private or public authorities.

Assuming, for the argument, that the evidence warrants such a finding, it is quite manifest that the rights of the public in such a strip must be confined to the public user established. Generally speaking, the extent of a prescriptive easement is governed by the extent of the user. 37 Cyc. 40, and cases cited; Wayne Co. Sav. Bank v. Stockwell, 84 Mich. 586, 48 N. W. 174, 22 Am. St. Rep. 708; Scheimer v. Price, 65 Mich. 638, 32 N. W. 873; Kruger v. Le Blanc, 70 Mich. 76, 37 N. W. 880; Gentleman v. Soule, 32 Ill. 271, 83 Am. Dec. 264. That, in this case, would be simply the right to travel over and along the dock. It would not carry with it any right to use or enjoy the dock as a public wharf. That right would remain in the owners of the fee of the land over which the dock or wharf is constructed. As we have seen, that right of the owners of the fee has never been questioned until raised in this case and in the case of City of Buffalo v. Delaware, Lackawanna & Western R. R. Co., 190 N. Y. 84, 82 N. E. 513, 16 L. R. A. (N. S.) 506.

[16] This brings the court to the consideration of that case, and the holdings of the Court of Appeals in the disposition of the questions

there presented. That case was one in which the city of Buffalo sought to have a portion of the property in question east of Main street, and also that west of Main street, declared to be a public highway or street, and the piers, wharves, and docks erected thereon as public piers, wharves, and docks of the city of Buffalo. The trial court on the first trial sustained the rights of the defendant railroad company as to the property situate west of Main street, and held as to the property east of Main street that it should be declared to be a public highway or street, and the piers, wharves, and docks erected thereon public wharves and docks of the city of Buffalo. Upon appeal to the Appellate Division of this court, the judgment of the trial court in reference to the ownership of the Central Wharf property west of Main street was affirmed, but that portion relating to Front street, so called, east of Main street, was reversed. Mr. Justice Spring wrote the opinion on that appeal, which is reported at 66 App. Div. 488, 74 N. Y. Supp. 343. It appears from this opinion, and from the record, that in 1837 the city of Buffalo passed a resolution declaring all the docks between Commercial Slip and Michigan street to be a public highway. That particular resolution was introduced by the plaintiff in this action. The Appellate Division held it to be invalid, and of no effect as constituting a highway, and on appeal from the Appellate Division to the Court of Appeals the judgment of the Appellate Division was affirmed. 178 N. Y. 561, 70 N. E. 1097.

The retrial of the issues decided against the city was had before Mr. Justice Kenefick, who followed the Appellate Division, and directed judgment for the defendants. An appeal was taken to the Appellate Division, which affirmed the judgment of the trial court, and thereupon a further appeal was taken to the Court of Appeals, where the judgment was reversed, and a new trial ordered, upon the ground that certain findings of the trial court were inconsistent, and the appellant had the right to avail itself of the finding most favorable to it, which was to the effect that the street user had always existed on this street, or the dock which took its place. While the Court of Appeals had no power to make findings of fact, it did discuss and lay down certain principles of law applicable to the record as there presented, and held in substance, that the docks on the portion of the street involved in that litigation were private docks. Writing for the court, Judge Vann, in the course of his opinion, said:

"What is the situation according to the findings, when properly classified? About 1826 a public highway existed on the river front between Washington and Main streets. It still existed in 1838, when a dock was built by the abutting owners over and upon the land owned by them constituting said highway, covering it for its entire width and length. From that time to this the abutting owners have used the dock for dock purposes and the general public have used it for highway purposes, neither use excluding the other altogether, although doubtless interfering with it to some extent. Under these circumstances what became of the street when the dock was built? Can abutting owners destroy a street in this way? Did the construction of the dock annihilate the highway? There is no statute which gives it that effect, and according to the common law the street leaped from the ground to the dock and stayed there. * * * When a private dock is built over a public street upon the shore of navigable waters, the dock becomes part of the street and the public has a right to travel over it. Ownership

of the dock is not inconsistent with the existence of the street, any more than ownership of the land over which the street extended. Assuming that the defendant or its predecessors could lawfully build a dock over their own land, in order to reach the river, still, as their land was subject to the right of the public to travel upon it, they could not unreasonably interfere with that right, nor with the existence of the street, which was the foundation thereof. Two rights coexisted. The defendant, as owner of the river front, had the right to reach the water. As there was a street along the river front over the defendant's land, the public had the right to use the street. The building of the dock changed neither right. Both continued to exist, although under changed conditions. They met, but did not merge, nor did either destroy the other. The defendant had the right to use its dock, as a private dock, subject to the right of the public to travel over it, as they had previously traveled upon the land over which it was built. The city had no right to use the dock for dock purposes, but its citizens had the right to use it for street purposes. While the street followed the dock and covered the whole of it, that did not authorize the city to collect wharfage; and although the dock was private property, the same as the land beneath it, that did not authorize the defendant to prevent the public from using it for the same purpose that they had previously used the land. The easement for travel still existed, but it was over the dock, which took the place of the land constituting the street. The public had the right to travel in the same place and in the same direction that they had before, but instead of traveling upon the surface of the land they were obliged to travel, and had the right to travel, upon the structure that the defendant had placed on the land. That structure became a street for the purpose of travel and a private dock for use as such, with a superior right in the public in case of conflict through reasonable use of the respective rights."

On the argument of the appeal before the Court of Appeals the counsel for the city contended, as he and plaintiff's counsel now insist, that the existence of Front street along the margin of a navigable river gave to the public the right of wharfage in the docks, and counsel then cited in their brief used before the court the case of Barney v. Keokuk, 94 U. S. 324, 24 L. Ed. 224, and other kindred cases, as authority for their contention. The court, however, declined to follow it, and laid down the rule as enunciated in that portion of the opinion quoted. We must regard the doctrine as there enunciated to be the law of this case, and hold that neither the city of Buffalo nor the public in general acquired any right or rights in the docks or wharves in front of lots 74, 75, 76, 77, and 78, save the right to travel over or along the docks, and that they remained the private property of the upland owners. Such is the rule in this state, and was again laid down as the law in the case of Johnson v. Grenell, 188 N. Y. 407, 81 N. E. 161, 13 L. R. A. (N. S.) 551, and 112 App. Div. 620, 98 N. Y. Supp. 629, where it was held that where a highway was laid out on the margin of a navigable stream, and a lot was deeded by reference to a map showing that the lot abutted on the street, the conveyance of the lot carried with it the fee of the street itself, and the *riparian rights in the waters adjacent thereto.*

[17] To summarize, then, the situation: The only rights, if any, the general public has in Front street, so called, is the right to travel over and along it. To close this street will be depriving the public of no valuable or substantial right. It is not, and never has been, a thoroughfare in any proper sense. Communication from lower Main street to the eastern portion of the city never passed normally through

Front street; but the travel was over and along Ohio street, lying parallel to Front street and only a few feet to the north. Front street was, in fact, only of substantial service to the abutting property owners, and the shipping having the right to lie at the wharves. All the abutting property, as well as the fee of the street and the wharves, is now owned by the Lackawanna Railroad Company; so no private easement over this street is invaded by the closing of the street. We think it may be safely asserted that, in view of the limited easements and rights the public has in so-called Front street, nothing substantial is lost by the closing of the street. In the place and stead of the dilapidated docks now existing, substantial cement wharves are to be built, suitable for the proper accommodation of passengers and freight to be handled at this place.

It has been urged that it was possible to have adopted a plan by which the entire proposed station and its approaches could have been moved sufficiently further to the north, so as to have obviated the necessity of closing Front street at all. Doubtless there exists no engineering difficulty in so doing; but, were this to be done, it would, in turn, involve the moving of Ohio street correspondingly further to the north, which, in turn, would necessitate the appropriation of very valuable business property at a greatly enhanced cost in order to lay out the new Ohio street along such lines. At the same time, the evidence shows that such an arrangement would, to a corresponding degree, lessen the usefulness and value of the freight houses, proposed to be built under the elevated train sheds forming the approach to the passenger station, and offices fronting on Main street. Such a modification of the plan adopted could be carried out only at increased expense and disadvantage, without any corresponding advantage to the public.

We have made these comments because it is asserted, on behalf of the plaintiff, that by adopting the plan it did the terminal commission had been guilty of such an abuse of discretion that the plan ought to be declared illegal and invalid for those reasons. If the court were at liberty to revise and modify the plans adopted, we should hesitate long in substituting the one suggested by the plaintiff for that finally adopted by the terminal commission. We discover no good or substantial reason for any such modification. In any event, it can be safely asserted that, considering all the circumstances, there was no abuse of discretion on the part of the commissioners, and there exists no good reason for disturbing their considerate judgment on the subject.

[18] Among the claims urged by the plaintiff is that the terminal commission had no right or authority to provide in its plans for facilities for accommodating lake transportation, business, or lines. The evidence shows that the Lackawanna Railroad does contemplate leasing to lake steamboat companies certain dockage privileges, and anticipates that certain lines operating on the Great Lakes will utilize the wharves and warehouses, to be erected by it, in their business; and it is contended by the plaintiff that the plan to be adopted and enforced by the terminal commission can only provide for adequate railroad

facilities and services, as distinguished from transportation business done by water. We think, however, a brief recital of the facts will demonstrate that the contention of the plaintiff is not well founded.

All the property upon which it is proposed to build the passenger station, with its approaches, is already owned in fee by the railroad company, saving possibly some small outstanding interest in third parties. The train shed, with its tracks and approaches, is to be built upon an elevated structure. It is proposed to utilize the space beneath the train sheds for the purpose of receiving, storing, and handling express matter and other freight. Some of this freight will be brought to the warehouse beneath destined for shipment to points west by vessel. Other freight will be received from lake lines from the West destined for transportation east by the railroad. The Lackawanna is interested in steamboat lines engaged in this class of business. The same is true, also, of a large passenger business, and many persons traveling to Buffalo by water, or going west in the same way, transfer from boat to train, and vice versa, at this point. The plans adopted anticipate doing a large amount of this exchange business in both freight and passengers. Not all the freight so arriving will be through business, nor will all passengers be through passengers. Some of each will stop at Buffalo, and some will doubtless go east by other railroads having their termini in this city. The warehouses to be constructed under the train sheds are designed to furnish facilities for the doing of this class of business, and in this connection the Lackawanna will doubtless enter into arrangements with lake lines by which they will obtain adequate facilities for doing this class of business, to the advantage of both themselves and of the railroad.

We are unable to see how plans contemplating such possible use of the terminal facilities to be provided can be the subject of just criticism, or why the plan adopted should be declared illegal for any such reason. A complete answer to the plaintiff's contention is that the plan simply provides for the utilization of property already owned and controlled by the Lackawanna Railroad; that it all relates to the enlargement and extension of the company's legitimate business; that the construction of freight houses under the train shed is simply a utilization of space provided by the mode and method of approaches to its passenger station. Certainly it cannot be contended that the company is forbidden to so utilize its property, not only in its own interest, but where it will tend to advance the commerce of the city and the port.

[19] It is evident to my mind that the Legislature, in passing the Terminal Act, had such a situation clearly in mind. The very first section of the act authorizes the commission to adopt plans "for the purpose of relieving the congested condition of the railroad stations and terminals in the city of Buffalo, which plans shall require the railroads, *or other transportation corporations,* operating within the city of Buffalo, to make such changes," etc. By the sixth section it is provided: "The commissioners may agree with any railroad *or other transportation corporation interested*" as to what portion of the work shall be done by any such company, etc.

So we think the act contemplated the terminal commission should have in mind the entire transportation system (lake as well as railroad), and by its plans serve, as far as possible, the interests of both. Whether this be true or not, we think the commission was well within its rights and authority in approving the plan complained of.

[20] It is claimed by the plaintiff that the contract is void because no provision is made therein in respect to the fee of Liberty street, a portion of which, under the plan, is to be taken by the railroad. Plaintiff's counsel contends that the city of Buffalo is the owner of the fee of a portion of this street. The counsel for the defendant railroad companies, on the other hand, contends that the fee is vested in third parties. There is presented by these conflicting claims a question as to the title of this fee.

It is not necessary for the court to try out in this action the legal title to this parcel of real estate. The necessary parties are not before the court, so it could not render any final or binding judgment. It is, however, sufficient answer to the plaintiff's contention to say that, assuming the fee to be in the city of Buffalo, the railroad company cannot appropriate the property to its uses until it has, in fact, acquired title, whether the title is owned by the city or by third parties. If it is necessary that the title to these premises be acquired, as it clearly is, a proceeding can be taken to acquire the fee. If it is in an individual, it may be acquired by purchase or condemnation; if it is in the city, and not held for public purposes, a similar condemnation proceeding can be brought; or the terminal commission can institute a proceeding under section 7 of the Terminal Act, providing:

"In the event that it becomes necessary to ascertain the fair market value of any lands owned by the city of Buffalo to be exchanged *or sold by it*, the commissioners, by their chairman, shall make application to the Special Term of the Supreme Court for the appointment of three commissioners to ascertain the compensation therefor to be paid to the owners of or parties interested in the lands proposed to be taken."

We think this a complete answer to the plaintiff's position.

[21, 22] In and by the contract between the railroads and the terminal commission it is provided, in substance, that if the appraisal value of the lands agreed to be conveyed by the commission to the New York, Lackawanna & Western Railway Company shall exceed the appraised value of the land agreed to be conveyed by the railroads to the city, then, in view of the fact that the abandonment of Water, Prime, and Ohio streets, as well as other streets included in said plans, and the relocation of Ohio street, are necessary for the elimination of the grade crossings and tracks at grade on said streets, and in view of the fact that the railroad company has agreed to assume and pay in the first instance all the expense of the relocation of streets and the elimination of grade crossings therein provided for, the city of Buffalo shall assume and bear a portion of such expense of eliminating grade crossings, and relocating streets, and that the measure of the city's contribution and proportion thereof shall be the difference in value between the appraisal value of said parcels to be conveyed to the railroad and the parcels to be conveyed to the city as therein provided. It is further provided that in case, on such appraisal, there

shall be a balance in favor of the railroad, in that event the railroad will release and discharge the city from any obligation to pay the same.

An appraisal commission was duly appointed by this court, of which Hon. Albert Haight, former judge of the Court of Appeals of this state, was the head. The commission had its hearings and has made its report, which was introduced in evidence upon this trial. In and by said appraisal and report it appears that the value of the parcels to be conveyed to the railroad exceeded that to be conveyed by the railroad to the city by about the sum of $98,000. Accordingly the contribution of the city toward the cost and expense of relocating streets and eliminating grade crossings is, under the provisions of this contract, the sum of $98,000.

It is contended by the plaintiff that these provisions of the contract are illegal, and render the entire agreement void. It is charged that it not only violates the letter of the statute under which the terminal commission is acting, but also violates subdivision 10 of article 8 of the Constitution of the state providing that:

"No county, city, town or village shall hereafter give any money or property, or loan its money or credit to or in aid of any individual * * * or corporation."

The evidence given upon this trial establishes that the expense of the elimination of grade crossings and the relocation of streets, as provided in the contract, independent of any other cost of terminal improvement, will be approximately the sum of $572,712.50. On this basis, the city will bear about 17 per cent. of the cost, and the railroad about 83 per cent. We may, perhaps, take judicial notice that under the Grade Crossing Commission Act, after which the Terminal Station Commission Act was partially modeled, and which has been in operation since 1888, the contracts with the railroads for the elimination of other grade crossings in the city, divide the expense as follows: The city pays 35 per cent. of the cost of the structures within the street limits, including the masonry abutments outside of the street limits on which the structures rest, and the railroads 65 per cent. thereof. The city bears 45 per cent. of all consequential damages to abutting properties, and the railroad 55 per cent.; and the railroads all expense of changes of their right of way outside street limits, except as above mentioned. It will thus be seen that the amount agreed to be paid by the city in this instance is very small in comparison with that contributed by the city toward the cost of the elimination of grade crossings coming under the jurisdiction of the grade crossing commission, and cannot be fairly said to be the subject of just criticism as to the amount.

It only remains, therefore, to inquire whether the manner and method adopted is illegal, or violates some provision of law or of the Constitution. As we have previously shown, the terminal commission exercises the powers of the grade crossing commission within the territory falling within its jurisdiction. By the sixth section of the Terminal Station Commission Act, it is provided as follows:

"The commissioners may agree with any railroad or other transportation corporation interested, or any of them, what portion of the work necessary to be done shall be done by any such company interested, and what portion of the work shall be done by the city, and what portion of the cost of the proposed improvement shall be paid by each. The cost of any structure and the maintenance thereof built upon the lands to be used by any railroad company in the erection and maintenance of its railroad passenger or freight stations, yard or approach, shall be at the sole expense of the said railroad company interested."

In the event the commission and the railroads are unable to agree on the amount or proportion to be borne by each, by section 8 of the act a method is provided for determining and fixing, by the Supreme Court, *"the proportion of the cost of the proposed improvement to be paid by each."*

Section 11 provides that the commission may authorize the railroad to do the entire work, and the cost thereof shall be apportioned as provided for in section 8; and section 15 gives the city power to issue bonds to pay for its share of the expense of the work. The scheme contemplates that the burden of the cost of the work, in so far as it relates to the elimination of grade crossings, shall be borne by both the railroads and the city. Judge Chase said, in construing this act in the Court of Appeals, in People ex rel. Simon v. Bradley, 207 N. Y. 592, at page 619, 101 N. E. 766, at page 775:

"I am of the opinion that the act does not contemplate the use of city money, directly or indirectly, for private purposes. It is true that the expenditures for street purposes are in large part made necessary by changes in the terminal facilities of the railroads provided by the plans adopted by the commissioners; but the changes in the streets are, nevertheless, city purposes, and the expenditures therefor proper public expenditures."

But criticism is made as to the method of payment. The method which the plaintiff contends under the act to be only lawful would be the payment by the railroad company into the city treasury of the $98,000 excess in value of parcels, and then the repayment by the city of the same sum back to the railroad. This, we take it, would be an idle and useless formality. This is a court of equity, which' looks at the substance of things, and not at technicalities, and, so long as the real purposes and objects of the statute are observed, we think it a matter of little consequence as to the mere method of payment.

It was the evident purpose of the commission to so frame this contract as to save the city from the actual payment of a dollar in cash from its funds for the terminal improvements and the changes to be made. This has been accomplished by a contract calling for the expenditure of several millions of dollars by the railroad without the actual payment of a dollar in cash by the city, or any contribution by it to the changes made, save in the manner pointed out, which involves no cash payment by the city.

These changes are of undoubted value to the railroad, and they are of great and undoubted advantage and value to the city and to the general public. The benefits conferred are mutual, and we believe the plans and contract fair and just to all concerned.

Other objections are raised by the plaintiff to certain other features

of the plan and contract, but we deem them of not sufficient importance as to call for discussion in this opinion.

[23] In closing, it is perhaps proper for the court to add that, had this court reached a conclusion that the contract attacked is invalid in certain of its provisions, which are capable of modification, so as to eliminate its illegal features, it would not be justified in declaring the entire contract illegal and void, but in the exercise of its equitable powers and discretion, would have the right to give the parties to it an opportunity to correct or modify the contract in that respect before condemning the entire plan and contract in the carrying out of which the railroads have already expended several hundreds of thousands of dollars, and entered upon contracts for doing work involving many more hundreds of thousands. Such action would, under such conditions, be just and equitable. Fortunately, by reason of the views entertained and pointed out by the court, no such action is required on the part of the court.

The plaintiff's complaint should be dismissed, with costs of this action to the terminal commission and to the railroad defendants. Let findings be prepared in accordance with the views above expressed.

So ordered.